Mr. Avila challenges both his conviction and alternatively his sentence. Regarding his conviction, he was convicted under 18 U.S.C. 922-N for receiving a firearm while under indictment. The Supreme Court opinion in Broome offers a new methodology that applies to Second Amendment challenges. But your problem with Broome is that you're under plain error review here and Broome doesn't speak unequivocally enough to your point to establish plain error. Broome establishes a new methodology which is directly applicable to a challenge to the Second Amendment. But was it obvious, would it have been obvious to the district court? No. In February is when Mr. Avila was sentenced and Broome came out in June and so given the fact that Broome abrogated the standard that this court applied, it would not have, it issue at that time. So the methodology is very clear and a straightforward methodology of looking at the plain text of the amendment and the historical analysis of whether there's a historical tradition creates the obvious conclusion that 922-N violates the Second Amendment. The plain text looks at whether or not, looks at the conduct regulated and 922-N regulates receipt. Receipt is a necessary condition to possessing a firearm and every court that has looked at the plain text before Broome and after Broome has found that receipt falls within the plain language of the Second Amendment. Those are only district courts so far, right? Correct, Your Honor. Correct. This court has not analyzed 922-N either pre-Broome or post-Broome. But the plain language of the Second Amendment regulates to have a weapon. That would be the common language understood by the people at the time. And Heller made it very clear that possession and keep would be understood commonly as to have. Well, you can't have a gun without getting it first. And that passive receipt is conduct regulated by 922-N and that falls within the plain language of the Second Amendment. That shifts the burden to the government to produce historical evidence of a tradition from the founding era that the founders intended someone accused of a crime to not have guns. Of course, there was, if the person theoretically, I mean, Broome also says you have to reason by analogy in a lot of situations. And the person, quote, accused of a crime has been determined that there is probable cause that the crime was committed, right? So it's sort of, at the very least, halfway between presumption of innocence on the one hand and we've already jailed him because he's, you know, going or denied in bond or has been convicted. There's a lot to unpack there, Your Honor. Let's start with the actual analysis of what the government has to show. Broome makes very clear that the type of evidence the government has to point to depends on whether or not it's addressing a societal problem contemplated during the founding or could have been contemplated during the founding or whether it's uniquely modern, meaning it was unthinkable to the founders. A person accused of a crime and under indictment is not a novel concept. It was something the founders would have contemplated and could have contemplated. Well, a person who was accused of a felony was going to hang. Well, the definition, well, they may have hanged after conviction, but not merely because of accusation. And felony during the founding era was wildly different than how felony is defined now in the sense that there were a much more narrow subset of crime that was put to death for felony conviction. So what the government has to show is a distinctly similar evidence that would constitute a tradition. That makes this a straightforward case, just as Heller and Broome were straightforward cases, because whether someone's accused can have their Second Amendment right interfered with is a straightforward problem. Now, distinctly similar means pretty close to identical. Broome identified one statute of all of the historical evidence put before it that was basically the same as the New York regulation, but they said, even though it's the same, one example is not enough to constitute a tradition. And I think that's an important part of the analysis that cannot be lost, is it's not pointing to just one statute or one act of commentary. It's proof of a tradition. And we know from Broome that one example of a distinctly similar regulation is not good enough. And there's language where it compares, Broome also compares, three colonial statutes that called into question whether three examples would be good enough for a tradition. And so the government largely fails to address that distinctly similar versus relevantly similar analysis. Relevantly similar applies to those uniquely modern problems that the founders would not have even thought to contemplate. New types of weapons, robots, who knows? There's plenty of modern day society that I'm sure the founders could not have contemplated. But the point is, they could contemplate what to do with someone under indictment. And the government has not drawn a straight line from 922N back to the founding era, which is the relevant time period for a federal statute, which would identify a regulation of this kind. There is a case, I assume a case is coming up to this court that's on non-plain error review, correct? Heroes, Your Honor. It's 22-50834. That's correct. 22 what? I'm sorry. 22-50834. Has that been submitted to a panel yet? The briefing calendar was just issued. Oh, okay. Brand new. All right. And it's Kuros, Q-U. Yeah, Kuros. But a couple other courts have upheld 922N post-Bruin, right? Correct. The Western District of Texas, and in fact, the same judge who found 922N unconstitutional in Kuros is the same judge whose Mr. Avila's case was before. He just didn't have an opportunity to raise it because Bruin hadn't been issued yet. Holden, out of Indiana, also struck it down. And Istanbul as well. Counsel, you referred to 922N. You said a regulation like this. Is 922N a statute? It is a statute. And what you had in Bruin was a regulatory scheme. And please let me clarify that any encroachment on the Second Amendment is how I'm using regulation not as a civil matter versus a criminal matter. The deference is first to the Constitution, not to an act of Congress in this particular situation where we've got such a fundamental right at issue. So the conduct, I do not believe that the court limited its test to licensing regulations, but whenever the Second Amendment right is encroached upon. So if there is a law that interferes with an individual's exercise of having a gun, that is something that falls within the Second Amendment and has to be analyzed under the Bruin methodology. But Bruin was a regulation that dealt with everybody in New York. Right? And here we have a statute that only applies to people who have been indicted. You don't see that difference as significant? I don't. Because, again, if we follow the methodology of Bruin, it starts with what does the Second Amendment mean? The people was defined by Heller as all Americans. In fact, it expressly rejected interpreting the Second Amendment as carving out an unspecified subset of the population. Sorry to interrupt, but is Avila a legal resident? Is? Yes. Okay. We don't have that issue, Your Honor. Okay. So, all Americans. I know much debate exists over what to do with Heller's language of law abiding, and I think the proper way of looking at that comment is tied to the purpose, the use of the firearm. And the answer of Heller's answer can be tied back to its question, which was presented as whether or not the Second Amendment applies to just someone involved in the militia or as an individual right to have firearms for a lawful purpose. So, law abiding speaks to the purpose, not some slicing and dicing of the people under the Second Amendment. Yeah, but your theory is, you know, if a person is under indictment, quite often they're subject to incarceration pending trial. So, you're saying it would be okay for them to receive firearms pending trial if they're in detention? We have a process for that, Your Honor. And the Bail Reform Act is distinctly different than the criminal prohibition where mere receipt of a firearm results in its own felony punishment. Depending on, and the Bail Reform Act is tied to a specific crime charge. It becomes part of the process for a specific crime charge, not a separate crime for which there's no process. It's, suppose somebody's in detention pending trial and someone smuggles in a pistol in a birthday cake or something like that. You're saying that's not illegal receipt of a firearm? They have a Second Amendment right to it? That is a highly distinguishable set of circumstances because we've got a place, a question of place and sensitive place. So, maybe it's an as-applied right? No, I believe that 922N facially is unconstitutional. The statute makes no distinguishment between where or how or type of weapon. Heller, you know, the argument is not that Bruin creates a free-for-all. It's very clear that, like any right, it's subject to regulation. But Heller was also very clear to identify the scope of regulation as type of weapon, manner of carrying. So, the misuse of weaponry, walking around terrorizing your neighbors with your pistol, that is not what we're talking about today. It's the passive receipt of a firearm that falls within the plain language and the government has not identified a founding era tradition that a person accused of a crime could have their right interfered with. All righty. Do you have any comments about the sentencing enhancement? You briefed? The briefing is comprehensive. I do believe that the conviction is the more pressing issue. All righty. Well, thank you. You have time for rebuttal. Thank you. Mr. Fowler. Good morning, Your Honors, and may it please the Court. Charles Fowler for the United States. This Court should affirm the defendant's conviction and sentence. Like my opponent, I'll focus on the conviction and the Second Amendment issues. And I will begin where Judge Smith's question began, which is with the standard of review here. This case is before this Court on plain error. And as we described in our briefing, I think the fact that this is a statute that this Court has not addressed before is itself dispositive. In fact, no court of appeals, whether pre-Bruin or post-Bruin, has addressed a Second Amendment challenge to 922n. I think there might be some instances in which a new precedent applies so unambiguously, so clearly, to a somewhat different scenario or somewhat different statute that the plain error standard can be satisfied. But at a minimum, I think that would have to be a scenario in which the holding of the new precedent on its face controls the new scenario without resort to a whole bunch of extrinsic analysis or circumstances that are not addressed in the precedent. Here, as some district courts have pointed out, the application of the Bruin framework to these federal gun laws is frankly just far from clear. You have to begin with developing a—well, first of all, you have to undertake the textual analysis, the first prong of the Bruin test, which was not even really disputed in that case. So it's a little bit difficult to clearly apply that part of Bruin to a new scenario like this. I wouldn't—I think the facts of that case were tolerably clear, so I wouldn't risk too much on that. Understood, Your Honor. But from there, you still have to develop an extrinsic historical record with respect to a totally different kind of law here than what was addressed in Bruin. The historical record that the court examined there was aimed at determining whether what was essentially a ban—a blanket ban on public carry subject only to an exception within the discretion of the executive. That's pretty much how the court characterized that law, and that's the record the court set out to analyze, and the discussion that resulted in that opinion just doesn't have a clear, unambiguous application to this scenario. And so for that reason, the government believes the defendant here can't clear the plain error standard. But turning then to—we don't think it's just that the defendant can't clear the plain error standard. We, of course, have in the Hopper a case where the issue is preserved, and we believe that this statute is constitutional under the Bruin framework for two reasons. First, we believe that under the textual prong of Bruin, the statute at issue here covers no conduct burdened by the Second Amendment right, and we also believe a sufficient historical tradition supports this kind of regulation. As to the textual prong, as the Supreme Court observed in both Heller and Bruin, the text of the Second Amendment codifies a preexisting right. And so when you read the text of the Second Amendment, just as with Bruin's second historical tradition prong, the history informs the interpretation of the text, and we believe that Heller in particular supports the notion that the text of the Second Amendment does not codify an And the defense brief, and I think an argument today to some extent, takes issue with the notion that a person's status, as opposed to what they're doing with the gun, the receipt part or the possession part, that the person's status can never be considered at the first textual step of Bruin, and we believe that's wrong. We believe the fact that this person was under indictment is relevant to the textual step of Bruin. Not only did Bruin repeatedly, and this is not some passing fleeting reference to a right available to law-abiding citizens. By my count, the Bruin court used that characterization 11 times in the majority opinion. The Third Circuit's recent decision in range, which was a 922-G1 case, actually counted 14 times. I could only get to 11, but the point is it was something that the Supreme Court emphasized over and over and over again, and I think the Bruin court did so in the context of delineating the scope of the right itself. The court actually divided its analysis into a couple of different parts. The first part was the textual inquiry, and that's the part where the court noted that it was relevant that the petitioners there were undisputedly two law-abiding adult citizens. Really, the textual inquiry was not seriously disputed in Bruin, but the point is the place in the analysis where the court flagged the petitioner's status as relevant was in the textual part of the analysis. A couple of other aspects of Bruin seem to confirm that the person's status as law-abiding is relevant to whether the Second Amendment scope covers them. One is the court's statement, and then emphatically reiterated in Justice Kavanaugh's concurrence, that the court was not casting doubt on what it called shall-issue licensing regimes. The shall-issue regimes worked differently than the licensing regimes under consideration because rather than giving an executive discretion to grant or withhold licenses, they set objective, narrow objective criteria for determining eligibility. The court said, we're not saying anything to cast doubt on those because those objective criteria serve to differentiate or serve to allow jurisdictions to differentiate between those who are and aren't law-abiding. You know, you're standing the argument on its head because it's one thing to talk about a shall-issue, which permits the carriage of the gun, and this is shall-deny on pain of felony prosecution. Yes, Your Honor, but I think the inverse of a shall-issue is that if you flunk one of the objective criteria, then you're denied a license, and the result of that would be— Well, which would have been a criminal conviction, right? I mean, are there any states who have shall-issue laws that say that nobody under indictment can get a permit? Yes, Your Honor, and as our brief points out, both the Texas shall-issue regime and the Ruin mentions that 43 states have these types of— Well, Texas is now constitutional carry. Well, yes, Your Honor, and of course there's a lot of variation in these licensing regimes, what you have to have it for, whether it's concealed or open or what have you. But the point is, yes, to answer Your Honor's question, some of the regimes at the very least do set objective criteria that disqualify those under indictment. I believe they all require as a precondition to a license going to— Suppose you're under indictment for tax evasion. Yes, Your Honor. Suppose you're under indictment for Medicare fraud. Yes, Your Honor, I believe that there is no historical support or support in the text for that matter for distinguishing between violent felons and nonviolent felons with regard to who can be considered non-law abiding and therefore outside the scope of this— Well, you're putting the burden on them. You're not explaining how the government has a right to regulate those situations. I mean, it could be an as-applied unconstitutionality, I suppose. Well, the only question before the court now is presented by way of a facial challenge. And so, of course, the defense has to show that no application of this statute would be constitutional. And again, they have to show so under the plain error standard. I will note, as far as an as-applied challenge goes, I think Mr. Avila is a particularly poorly suited candidate for one, and perhaps that's why we don't see one. But he was not only indicted, he was subject to deferred adjudication in Texas, which means he had pled guilty. So any notion that the individual in this case was presumed innocent at the time he was caught with the gun is undermined by the record, since he had actually pled guilty to the underlying crime. But I think maybe to address the court's question more directly, I could then turn to the actual historical evidence of excluding individuals who are non-law-abiding citizens. And it is a lengthy history. I think the history both, as I said earlier, informs the text, as well as the second Bruin prong of historical tradition. I could go all the way back to the 1300s, but I think perhaps the most sort of relevant starting point in English history is the Militia Act of 1662, which granted executive officers— Yes, and that was before the Glorious Revolution, was it not? It was. And the whole point of talking about law-abiding citizens, if I infer correctly from my admittedly not having gone totally back into the historical record, was that anybody who was—the people who were regarded as non-law-abiding were those who opposed the king. In other words, it was a status offense based on political dissent rather than on the highwaymen or the robbers of the day. The language of the statute referred to those who were deemed as dangerous. Yeah. There is perhaps some historical support for that reading, but— And this—and 1662 may technically have been when Cromwell was the regent or whatever, but they were still—both sides were pretty harsh on their opponents. Yes, Your Honor. Let me—I mean, I think that's—there's some historical support for that. I think that's just sort of a starting point. I mentioned it to sort of frame the analysis. I think you could— Well, I know. I'm just saying that that argument—if the government makes that argument in regard to every gun regulation, they're going to lose every case. So I'm not—you know, I don't have a preconceived notion at this point about 922N, but the argument about dangerous from 1662 ain't going to carry the day. That's one of the many reasons we rebelled. Understood, Your Honor. So let me fast forward to early American history and discuss some of the evidence from the Revolutionary period. And, in fact, this court in the National Rifle Decision in 2012, which, of course, was abrogated in part by Bruin, has a fairly extensive historical analysis of the laws from that period, as do several other pre-Bruin cases as well as the Third Circuit's recent decision in range. And those courts have all pointed as establishing a tradition of disarming certain groups for public safety reasons to laws that disarmed individuals who, for example, wouldn't take an oath of loyalty to either the state or the newly formed national government. And I think the Third Circuit's recent post-Bruin decision did a really good job of distilling a principle from these discussions, which is that the Second Amendment encompasses a principle of allowing legislatures to disarm those who we think are untrustworthy to essentially follow the social compact, to follow the rule of law. And so it's always been permissible under the Second Amendment. I think you can say that's true either under the scope of the amendment or the scope of the restrictions that are historically allowed. It's always been true that if the society, through their elected representatives, figure you're untrustworthy to follow the law, that is someone who can historically be disarmed. So we've got oaths of loyalty. Of course, the briefing also discusses, in the context of those who are accused of posing a threat, historical surety laws. We recognize, of course, that there are some differences in the way those operate from the way 922N operates. But we also believe those are a relevant analogy that establishes a tradition of disarming folks who are thought to pose a threat. With regard to individuals who are accused of a crime in particular, we discuss in our brief the line of authority, including the Salerno decision by the Supreme Court in 1987, which recognizes, and this is important because both Bruin and Heller established or confirmed that in construing the Second Amendment and its scope and its exceptions, you do it just the way you would many other constitutional rights that are enumerated in the Bill of Rights. The Court refers to the Fifth Amendment, the First Amendment. And so I think that makes it particularly relevant to look to the liberty restrictions that courts have always tolerated on indictment on probable cause. So Salerno, for example, dealt with the Bail Reform Act and upheld the notion that you can, consistently with the Fifth Amendment due process right, detain someone pretrial, the court reviewed the evidence. Has there been, just to refresh my recollection, before the Bail Reform Act, was detention pending trial allowed or not allowed? It was allowed, Your Honor. I think one of the, I was going to come to the 1789 Judiciary Act, which was just two years before the Second Amendment was ratified. And it allowed, it allowed the federal judiciary discretion whether to detain folks or release them on bond, except in capital cases. So individuals have been detained in capital cases going back to around the time of the Second Amendment and shortly before the Second Amendment. That too is, without getting too much into it, inherited from English tradition to some degree. But that certainly is an important point in time where we started imposing significant liberty restrictions on people based on an indictment. And every regime statutory since then has allowed some form or another. Again, I mentioned the Salerno decision. Salerno relies heavily on a couple of other cases. 1975, Gerstein v. Pew, which established that the Fourth Amendment right against unreasonable seizures can be restricted by extended pretrial restraints on probable cause. The court there said it doesn't have, it can be, probable cause has to be determined by a neutral. It's either got to be a grand jury or a judicial determination in order to restrict someone's liberty. But it can be done through informal procedures and does not need to be adversarial. The grand jury is sufficient. A few years later, in Bell v. Woolfish, the court held the same as to the Fifth Amendment, established the framework that was ultimately applied in Salerno and said that these challenges to, in that case it was conditions of pretrial detention, these challenges are framed in terms of the presumption of innocence, but the presumption of innocence is not a freestanding, sort of freewheeling doctrine that preserves liberty before trial. It's really just a shorthand for the government's burden at trial. It allocates the burden of proof and says that you have to prove, the government has the burden of proving someone guilty before they can be subjected to punishment, but they can be subjected to non-punitive liberty restrictions on a finding of probable cause. I'll end where I started. Courts have divided so far on 922N. There's one additional decision by the Middle District of Tennessee that was reported after I filed my 28J letter. It's United States v. Kelly. I will be happy to provide the court with a citation to that by letter afterwards, but the point is that courts are more— How did it come out? I'm sorry, Your Honor? How did it come out? It upheld 922N in a very extensive discussion based on the historical tradition of disarming folks who were deemed untrustworthy or dangerous, and I think it's probably the most comprehensive discussion to date of 922N, but it does acknowledge, in that court's words, that applying 922N requires courts to answer reasonably contestable and highly abstract questions of historical analogy, which I believe forecloses at a minimum a finding of plain error in this case. All right. Thank you, sir. Ms. Davidson? How does Salerno apply here? Well, I don't think it does based on how far-sweeping Grun is in what the correct methodology is. I mean, this is a facial challenge to 922N, right? Correct, and Brun and Heller were also facial challenges, and the court makes no discussion about whether there are some types of application that would still remain constitutional. The methodology, the test, is what is important. The test drives the conclusion. The test is whether it's textual, under the plain meaning of the Second Amendment, and then whether or not there is historical evidence. It cannot just be a scattershot of abstract terms. The government does have to draw a straight line to the relevant time period to show that this particular type of interference with the Second Amendment arises. The Stevens case was a facial challenge, wasn't it? Yes, Your Honor. And they overturned the statute, right? I'm sorry. Say that again, please. That was the animal cruelty statute, right? The one about the videos of animal . . . and the Supreme Court overturned the statute, right, or not? I do not have a clear . . . I'm sorry. I'm operating off the top of my head. I apologize for that. More recent than Salerno, anyway. I want to speak to plainness for a second, because plainness is determined by the status of the law as a direct appeal is pending, and Bruhn clearly drives the methodology here. I think it's important to note, practically speaking, that in a case pending before the court, Rahimi, case number 21-11001, Bruhn came down just after this court issued its opinion. The court took back its opinion, asked the parties to present supplemental briefing, and the government agreed that Bruhn drove the discussion of whether or not 922G8 is unconstitutional. And said explicitly that Bruhn applies to the analysis and should be exercised. So it is not the case that this is the typical type of forfeiture that the court sees when it comes to plain error. As part of a practical solution, because Kuros is also pending before the court, I think a practical solution, if the court is inclined to deny this on the plainness prong, would be to stay the decision until Kuros is decided, since that is on the merits. Regarding the facial challenge, I just want to reiterate... Well, let me just... Go ahead. Oh, I want to reiterate with the facial challenge that Bruhn and Hiller were facial challenges, and Bruhn made absolutely clear that it is text and history, and it goes... Well, what do you say about his arguments at, like, the 1789 Judiciary Act? Well, right before passage of the Bill of Rights can be relevant, but I don't think it's relevant in this case, because 922N creates a separate crime. This is not about, say, someone being accused of misusing a firearm, scaring people with it. They're arrested. There is a process in place for whether or not there are limits on liberty. That's a different question than 922N, which creates a separate federal prosecution and very punitive liberty restrictions. Well, I mean, he was lucky. You know, he was indicted for armed burglary at the time that they picked him up, so he was sort of lucky to be at liberty under those circumstances. And you would think armed robbery would per se be somebody who was suspect of being dangerous and worried about whether the government could be legitimately concerned about whether an armed person was going to show up for trial and hearings. 922N provides no proper cabining that would make it a more direct line back to the types of laws that existed and were relevant around the time of the founding. Someone who's misusing firearms, someone who's creating terror of their neighbors, is the type of prohibition that was upheld, unless there are any further questions. Thank you. No. All right, thank you. Thank you.